The undersigned have reviewed the Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties at the initial hearing, as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. Defendant-employer is a qualified self-insurer, and at the time of the injury giving rise to this case, Gay Taylor was acting as its third-party administrator. Effective January 1, 1996, GAB Robins North American, Inc. became the third-party administrator for the employer.
4. Plaintiff sustained an injury by accident arising out of and in the course of her employment on September 7, 1993, involving an injury to her left wrist.
5. At the time of the injury giving rise to this case, plaintiff's average weekly wage was $205.59, yielding a compensation rate of $137.07.
6. The parties entered into an I.C. Form 21, Agreement for Compensation for Disability, on October 22, 1993, and that agreement was approved by the Industrial Commission on November 29, 1993.
7. Plaintiff was first out of work following the injury on September 28, 1993, and she returned to work for the defendant-employer on December 13, 1993. After working a portion of the day on December 13, 1993, plaintiff left work, and she has not returned since. Plaintiff thereafter returned to work for another employer on April 11, 1994.
8. Plaintiff was paid the benefits described on I.C. Form 28B, filed by the employer on May 26, 1995.
9. The following documents are stipulated into evidence:
a. Records of Dr. Richard Bloomfield (7 pp.)
b. Records of Dr. Jeffrey K. Moore (20 pp.)
c. Records of Dr. Irl K. Wentz (2 pp.)
d. Carteret Physical Therapy (10 pp.)
e. Southern Rehabilitation Network (21 pp.)
f. Industrial Commission Form 28B dated May 26, 1995.
10. The issues to be resolved are:
 a. Is Plaintiff entitled to an additional period of temporary total disability benefits during the periods of September 11, 1994 through February 5, 1995?
 b. Is plaintiff entitled to temporary partial disability benefits from February 6, 1995 and continuing until further Order of the Commission?
 ***********
Based upon all of the competent, credible, and convincing evidence of record and reasonable inferences drawn therefrom, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of the initial hearing in this case, plaintiff was a thirty-one year old female born on December 5, 1964, and currently with two minor children. She is right-handed.
2. Plaintiff is a high school graduate, having graduated with a G.P.A. of 3.0 and with a class rank of 44 out of 171 in her class at East Carteret High School in 1983. Over a period of several years in the late 1980s and early 1990s, plaintiff attended Carteret Community College, successfully completing classes in both business administration and general office technology.
3. In 1993, before the injury giving rise to this case, plaintiff enrolled in a ten week bank teller training course at Craven Community College in New Bern. Plaintiff successfully completed this class on November 9, 1993.
4. Before becoming employed with the defendant-employer, plaintiff had held a number of different jobs, all of which she obtained on her own without any vocational assistance. Plaintiff's previous work experience included jobs at a nursing home, a child care facility, and several periods of employment with textile companies. Plaintiff's longest-held job before she came to work for defendant-employer, Russell Corporation/Cross Creek Apparel, was her position as a community social worker assistant with the Carteret County Department of Social Services, a position she held from July 1990 to December, 1991. Plaintiff was terminated from that job as a result of a conflict with her supervisor.
5. Plaintiff was first employed by defendant-employer as a sewing machine operator on July 28, 1992. In that position, her base rate of pay was $5.00 per hour.
6. On September 7, 1993, after reporting to her employer that she was having problems with her left (non-dominant) hand, plaintiff presented to Dr. Richard Bloomfield. Plaintiff told Dr. Bloomfield that she had been having problems with her left hand for about six months. Dr. Bloomfield's diagnosis was left carpal tunnel syndrome, and he allowed plaintiff to return to work using a splint.
7. Dr. Bloomfield again saw plaintiff on September 9, 1993 and September 14, 1993. When plaintiff continued to complain of problems with her left hand, he ordered nerve conduction studies and referred plaintiff for an evaluation by Dr. Jeffrey Moore.
8. Plaintiff first presented to Dr. Moore on September 23, 1993. Dr. Moore examined plaintiff and diagnosed her as having either tendinitis or carpal tunnel syndrome. Based on his examination and assessment of plaintiff's condition, Dr. Moore also concluded that plaintiff was a person who could not tolerate any work involving heavy use of her hands. He explained his conclusions to plaintiff and advised her to seek another type of employment. Throughout the time that he treated her, Dr. Moore continued to emphasize to plaintiff that she should not return to work as a sewing machine operator or in any other position involving heavy use of the hands, and that she should look for another type of job.
9. As explained to plaintiff by Dr. Moore, there are certain people who are simply not able to tolerate work that involves heavy use of the upper extremities. Even people who have worked in such jobs at earlier ages may reach a point in their lives when they cannot continue to tolerate such work because they are not physically suited for the job requirements. This was the case with plaintiff beginning in November 1993. Therefore, Dr. Moore did not release plaintiff to return to her job with the defendant-employer and encouraged her to seek other employment.
10. After conservative management failed to alleviate plaintiff's complaints, Dr. Moore performed surgery on November 16, 1993. The surgical procedure involved a release of stenosing tenosynovitis, first dorsal compartment, left wrist, and a steroid injection, carpal metacarpal joint, at the base of plaintiff's left thumb. During follow-up visits after the surgery, Dr. Moore continued to encourage plaintiff to pursue employment not involving heavy use of her hands.
11. On November 29, 1993, the parties entered into an I.C. Form 21 Agreement for Compensation whereby the defendant-employer accepted as compensable the injury to the plaintiff's left wrist. Pursuant to that agreement, defendants paid plaintiff temporary total disability compensation for the period that she was out of work from September 28, 1993 through December 12, 1993.
12. Despite Dr. Moore's recommendations that she consider another type of employment, plaintiff attempted to return to her job as a sewing machine operator on December 13, 1993. After working only a part of the day, however, plaintiff left the job and returned to Dr. Moore on December 15, 1993, complaining of pain and numbness in her arm and hand. Dr. Moore again encouraged plaintiff to seek another type of employment.
13. On September 7, 1993, when plaintiff had first gone to Dr. Bloomfield, she had been asked to complete an intake form consisting of certain questions about her medical history and condition. One of those questions was "Planning Pregnancy?" Plaintiff check the space for "yes." Consistent with that answer, in December 1993, plaintiff realized that she was indeed pregnant. Plaintiff insisted at the initial hearing that at some point after September 1993 and before December, she had changed her mind about having another child and in fact was taking birth control pills. Due to the conflicting evidence, no finding is made regarding whether plaintiff's pregnancy was intentional.
14. On January 13, 1994, plaintiff was seen for a final visit by Dr. Moore. At this time, he found plaintiff to be at maximum medical improvement, and he released her to return to work in any job that did not involve heavy and repetitive use of the left hand. When asked several months later for specific job restrictions, Dr. Moore stated that plaintiff should be restricted to lifting no more than five pounds with her left hand and fifteen pounds with both hands. Plaintiff has no restriction on the use of her right hand and no restriction on the number of hours that she can work.
15. Although released from care and encouraged to seek other employment by Dr. Moore, plaintiff made no effort whatsoever to find employment during the period from January 13, 1994 to March 7, 1994. At that point, defendants retained Meredith Ellis, a certified rehabilitation counselor (CRC) with Southern Rehabilitation Network, Inc. to work with plaintiff on a job search.
16. Ms. Ellis first met with plaintiff on March 10, 1994. During their first meeting, Ms. Ellis obtained background information from plaintiff, including information about her educational level and prior work experience. Ms. Ellis also inquired of plaintiff as to how she had obtained her prior jobs, and learned that plaintiff had successfully conducted her own job searches for all of her prior employment.
17. By the time that Ms. Ellis first met with her, plaintiff was three months pregnant, and the pregnancy was a significant barrier to Ms. Ellis' efforts to locate full time employment for plaintiff at that time. Ms. Ellis nevertheless proceeded to identify a number of potential jobs for plaintiff, but plaintiff's compliance with Mr. Ellis' recommendations was minimal, and she failed to follow up on a number of the job leads that Ms. Ellis identified.
18. After failing to pursue most of the job leads identified for her, plaintiff told Ms. Ellis on April 13, 1994, that she had located a baby-sitting job on her own and had begun work in that job on April 11, 1994. During their conversation, plaintiff told Ms. Ellis that she felt that this would be the most suitable employment for her at that time, and she did not request any further vocational assistance. In fact, plaintiff told Ms. Ellis that her intent was to seek employment as a bank teller sometime after the birth of her child.
19. Effective April 13, 1994, plaintiff returned to employment, working for Monica Felton as a baby sitter. Plaintiff worked Monday through Friday, from 8:00 A.M. to 3:00 P.M., caring for two children (ages 6 months and 3 years). In this job, plaintiff earned $70 per week.
20. Because of plaintiff's decision to work in the baby-sitting job until after her child was born, Ms. Ellis closed her file and did not pursue any further job leads for plaintiff. Although plaintiff contended at the initial hearing that the baby sitting job ended sometime at the end of June, 1994, plaintiff made no attempt to notify defendants that she had stopped working, did not request any assistance on locating other employment, and did not make any attempt to obtain other employment, choosing instead to stay at home during the last months of her pregnancy.
21. The most significant barrier to plaintiff's quick return to full time work at earnings at least as great as those she had prior to her injury was her progressing pregnancy. But for the pregnancy, plaintiff would have in all likelihood successfully returned to full time work soon after being released to work by her physician.
22. Plaintiff's reduced earnings in her baby sitting job ($70.00 per week as opposed to $205.59 per week at defendant-employer's) are not causally related in any way to the compensable injury to her left wrist. Further, the left wrist injury in no way caused or contributed to plaintiff's pregnancy, nor did the injury augment to any degree any limitations associated with the pregnancy.
23. Defendants paid plaintiff weekly benefits in the amount of $137.07 for the period from December 15, 1993 to April 10, 1994, when plaintiff returned to work in the baby sitting job. Although it was plaintiff's pregnancy and not her injury to her left wrist that caused a reduction in her earnings for the period after April 11, 1994, defendants voluntarily paid plaintiff temporary partial disability benefits for the period from April 11, 1994, to September 11, 1994 when they learned that plaintiff had given birth to her baby.
24. Several months later, Paula Poole, who was the claims supervisor for the administrator Gay Taylor, attempted to contact plaintiff, first by telephone and then by letter, to determine plaintiff's situation and plans regarding a return to work. In a telephone conversation in November, 1994, plaintiff told Ms. Poole that she did not plan to return to work, and had decided to stay at home with her baby. Plaintiff made no request for vocational assistance during that conversation or at any subsequent time.
25. During the November 1994 telephone conversation, plaintiff told Ms. Poole that attorney Ralph Bryant was representing her. Mr. Bryant had previously had some contact with Meredith Ellis and had received copies of Ms. Ellis' reports, but he had not had any contact with the defendants and had not to Ms. Poole's knowledge entered a formal appearance in the case. When plaintiff stated she was represented by an attorney, Ms. Poole told plaintiff that she would need to have any further discussions about the claim with Mr. Bryant. Mr. Bryant subsequently called Ms. Poole, and she asked him to submit a written notice of his representation, which he then did. Ms. Poole related to Mr. Bryant that plaintiff had said that she did not plan to return to work, and Mr. Bryant said that he would check with plaintiff and get back to her.
26. Neither plaintiff nor Mr. Bryant ever told Ms. Poole or anyone else associated with defendants that she had changed her mind and wanted to go back to work or that she needed or wanted any vocational assistance at any time after her baby was born.
27. Plaintiff made no attempt at any time from June 1994 through January 1995 to seek employment, choosing instead to stay at home during the latter part of her pregnancy and the first several months after her child was born. Plaintiff's decision not to work during this time was a personal one, and her lack of earnings during this time is not causally related in any way with her compensable left wrist injury.
28. In January, 1995, plaintiff decided to apply for a position as an Outreach Coordinator with the Family Resources Center. This was the only job that plaintiff applied for or sought in any way, and she was immediately hired to begin work in February 1995. In this position, plaintiff has broad responsibilities for planning and conducting community programs, and she has very capably and successfully performed the tasks associated with this position. For the first eight weeks after she began work on February 6, 1995, plaintiff worked 8 hours per week at $5.00 per hour, and since then she has worked 16 hours per week. Plaintiff's rate of pay subsequently increased to $5.50 per hour, and at the time of the initial hearing, she had been approved for an increase to $6.50 per hour, with that increase scheduled to take effect at any time.
29. In her job with the Family Resources Center, plaintiff is allowed to work flexible hours, putting in her 16 hours per week on the days and times that she selects as appropriate. Her employer expects and encourages persons in this position to seek a second job if they desire to do so.
30. During the period from January 1995 to August 1995, plaintiff made no attempt to seek such a second job or to seek a full time position. In August 1995, plaintiff began working at Miss Molly's Day Care, a child care facility run by her cousin, and plaintiff has worked there periodically since August 1995. Plaintiff has made as much as $20 per day in this position, but her full earnings and earning capacity in such work cannot be determined because plaintiff has not always been paid for the time she has worked and has sometimes accepted gifts in lieu of wage payment.
31. Beginning in September, 1996, plaintiff has also taken another baby sitting job, and at the time of the initial hearing, she had worked two days in this position, making $15 per day.
32. Plaintiff has had no active medical care for her left wrist since January 13, 1994. No doctor has recommended that plaintiff have any further medical treatment. In February 1995, plaintiff sought a second opinion as to her condition from Dr. Irl Wentz, a physician in Morehead City. Dr. Wentz examined plaintiff on February 9, 1995. At that time, plaintiff told Dr. Wentz that she had a child five months old, and that she did some baby-sitting work. Dr. Wentz did not recommend that plaintiff have any further treatment for her left wrist. He concluded that there was no sign of any permanent impairment in plaintiff's left hand and consequently did not give her any rating.
33. Plaintiff has been at maximum medical improvement with respect to the injury giving rise to this case since January 13, 1994. As a result of the injury, plaintiff was unable to work in any capacity or to earn wages of any kind for the period from September 28, 1993 to December 12, 1993. She had been paid temporary total disability benefits and is thus fully recompensed for this period. Following December 15, 1993, plaintiff has been disabled from returning to work for the defendant-employer in any other position requiring heavy and/or repetitive use of her left hand; however, she has not been disabled from all occupations.
34. Defendants paid plaintiff temporary total disability benefits in the amount of $137.07 until she actually returned to work on April 11, 1994. Plaintiff's total disability related to the left wrist injury ended as of that time. Plaintiff has not suffered any temporary total disability related to the injury giving rise to this case since April 11, 1994, and the periods that she has been out of work since then are not causally related to the compensable injury. Plaintiff has not been given any impairment rating and thus has no permanent partial disability.
35. Plaintiff's reduction in earnings for the period from April 11, 1994 through September 11, 1994 was not caused by the injury giving rise to this case. Defendants, however, voluntarily paid plaintiff temporary partial benefits during this time.
36. At all times since April 11, 1994, plaintiff, by virtue of her education, work experience, communication and personal abilities, and job seeking training and resources provided to her through Ms. Ellis, has been fully capable of independently seeking and obtaining actual employment, and she has not needed further vocational assistance at any time after April 11, 1994. Defendants have not reassigned a vocational counselor to this case since April 11, 1994 because plaintiff said that she did not plan to return to work. Plaintiff has never requested any such assistance.
37. As soon as plaintiff elected in January, 1995, to seek employment, she obtained a job and she could have, if she had elected to do so, sought other part time employment or a full time job at any time since January 1995. In early 1995, when plaintiff took the job with Family Resources, there were jobs available in the local market of generally the same type and number as those Ms. Ellis had quickly located in early 1994. Plaintiff has been successful in easily locating part time work at Molly's Day Care and at other baby-sitting jobs as she has elected to do so. The competent, credible, and convincing evidence of record suggests that plaintiff is capable of locating a number of actual jobs and can select those at which she wishes to work.
38. Plaintiff has not made an effort to obtain full time employment since April 11, 1994. Therefore, her full earning capacity cannot be determined. Taking into account her age, education, work experience, and personal and communication skills, and the evidence regarding jobs available in the local market, plaintiff's earning capacity is at least as much as $205.59, her average weekly wage with the defendant-employer, and probably higher. Defendant has successfully presented competent, credible, and convincing evidence to show that plaintiff was capable of obtaining employment and that actual employment was available.
39. Plaintiff has no permanent partial disability as a result of the injury giving rise to this case
 ***********
The foregoing stipulations, findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. On September 7, 1993, plaintiff sustained and injury by accident to her left wrist, arising out of and in the course of her employment. G.S. 97-2(6).
2. As a result of the injury, plaintiff was entitled to compensation for temporary total disability for the periods from September 28, 1993 to December 12, 1993 and from December 15, 1993 to April 11, 1994. That compensation has been previously paid by defendants.
3. Plaintiff's temporary total disability ended no later than April 11, 1994, and as of that date, she had also reached maximum medical improvement. Plaintiff is not entitled to any further temporary total disability benefits after April 11, 1994.Ashley v. Rent-A-Car Co., 271 N.C. 76, 84, 155 S.E.2d 755 (1967).
4. Plaintiff does not have any permanent partial disability as a result of the September 7, 1993 injury to her left wrist. Although a claimant may elect to recover permanent partial disability based on loss of wage earning capacity, plaintiff has not proven that she sustained a permanent loss of wage earning capacity as a result of the September 7, 1993 injury. Anderson v.Northwestern Motor Co., 233 N.C. 372, 64 S.E.2d 265 (1951); Gaddyv. Kern, 17 N.C. App. 680, 195 S.E.2d 141, rev. denied, 283 N.C. 585,197 S.E.2d 873 (1973); Shaw v. United Parcel Service,116 N.C. App. 598, 449 S.E.2d 501, aff'd, 342 N.C. 189,463 S.E.2d 78 (1994).
5. Defendant's payment of temporary total disability benefits to plaintiff under a Form 21 agreement creates a presumption of continuing disability. Stone v. GG Builders,121 N.C. App. 671, 468 S.E.2d 510, rev. allowed, 343 N.C. 757,473 S.E.2d 627 (1996). However, the presumption has been successfully rebutted in the instant case. The greater weight of the competent, credible evidence of record is that plaintiff returned to work, and is capable of gainful full-time employment.
6. Plaintiff has not proven by the greater weight of the competent, credible, or convincing evidence that she continues to be disabled or has any continued diminished wage earning capacity as a result of her compensable injury. N.C.G.S. 97-2(9), 97-29.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982);McCoy v. Oxford Janitorial Service Co., 122 N.C. App. 730,471 S.E.2d 662 (1996).
7. Defendant has demonstrated by a preponderance of the evidence of record that as of no later than September 11, 1994, plaintiff had an earning capacity at least as great as her earnings had been with the defendant-employer.
8. It is irrelevant whether or not plaintiff's pregnancy was intentional because her pregnancy was not related in any way to her compensable injury. There is no competent, credible, or convincing evidence that plaintiff's failure to work for the last several months of her pregnancy and the first few months after her baby was born had anything to do with the compensable injury to her left wrist. The wrist injury did not cause plaintiff's pregnancy. Moreover, there is no evidence of record that plaintiff's pregnancy aggravated or augmented her compensable injury. English v. J. P. Stevens, 98 N.C. App. 466, 391 S.E.2d 499
(1990).
9. Plaintiff is entitled to have defendant provide any medical treatment arising from the September 7, 1993, injury to the extent that it tends to effect a cure, give relief or lessen her disability. N.C. Gen. Stat. 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Defendant shall continue to pay any future medical expenses that may be incurred by plaintiff as a result of the September 7, 1993 injury to the extent that such expenses and treatment are reasonably necessary to effect a cure, give relief, or lessen the plaintiff's disability.
2. Plaintiff's claim for additional workers compensation benefits for her injury by accident of September 7, 1993 must be and the same is hereby DENIED.
3. Each side shall bear its own costs, except that Defendant shall pay an expert witness fee to Dr. Moore, as previously ordered by the undersigned.
This case IS ORDERED REMOVED from the Full Commission docket.
This the _____ day of _______________, 1998.
 S/ _________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ________________ CHRISTOPHER SCOTT COMMISSIONER
S/ ________________ THOMAS J. BOLCH COMMISSIONER
JHB/kws